# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 11, 2012 Session

## STATE OF TENNESSEE v. JOSHUA BRANDON TATE

**Appeal from the Criminal Court for Davidson County**
**No. 2009-A-27    Monte Watkins, Judge**

---

### No.  M2011-02128-CCA-R3-CD - Filed July 31, 2013

---

Appellant, Joshua Brandon Tate, was indicted by the Davidson County Grand Jury for seven counts of sexual battery, eight counts of rape, and one count of solicitation of a minor.  A jury found Appellant guilty on all counts.  Appellant was sentenced to an effective sentence of twenty years.  The trial court granted a portion of Appellant's motion for new trial, vacating the rape convictions in counts seven through twelve, and the conviction for sexual battery in count thirteen.  As a result, Appellant's effective sentence was reduced to eleven years.  On appeal, the following issues are raised for our review: (1) whether the evidence was sufficient to support the convictions; (2) whether the trial court erred in admitting the recordings of the victim's interview; (3) whether the trial court erred in allowing testimony about Appellant's failure to attend voluntary interviews with the police; and (4) whether the trial court erred in allowing testimony about Appellant's failure to attend voluntary interviews with the police.  After a review of the record, we determine: (1) the evidence is sufficient to support the convictions; (2) the trial court properly admitted prior consistent statements of the victim in order to rehabilitate her testimony following cross-examination.  However, the trial court erred in admitting testimony to the effect that Appellant failed to attend voluntary police interviews, and this error requires reversal for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court are Reversed and Remanded.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

James O. Martin, III, Nashville, Tennessee, for the appellant, Joshua Brandon Tate.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General, and Kristin Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

The incidents that gave rise to the indictments herein were discovered when the victim, N.B.[1], was detained by the Metropolitan Nashville Police Department for truancy and brought before a guidance counselor at Stratford High School. N.B. was in tenth grade at the time and was born in January of 1993. During questioning by the guidance counselor, Ms. Jennifer Marciano, N.B. reported that her cousin, Appellant, was sexually abusing her at home. She claimed that the abuse started in January of 2007. At the time, N.B. was living with her grandparents, G.D. and R.B. Ms. Marciano reported the allegations to the police and to the Department of Children's Services ("DCS").

After Ms. Marciano's report to police, Detective Greg Robinson came to the school to interview N.B. He described the victim as "very upset." He asked the victim to make a controlled call to Appellant. Despite her emotional state, the victim agreed to cooperate. However, the call did not go through.

Detective Robinson asked the victim questions to determine the extent of the contact and abuse. During the interview, he did not use the word "penetration" when he asked the questions but tried to determine whether there was "skin-to-skin" contact between the parties. As a result of the information gleaned during the interview, Detective Robinson did not order a medical-legal exam.

Detective Robinson tried to interview Appellant on two separate occasions. The first time, Detective Robinson went to Appellant's home. When Appellant was not at the residence, he left a card with Appellant's mother with instructions for Appellant to call and set up an appointment. Appellant complied but missed the appointment. A few days later, Appellant called and claimed that he took some medicine and fell asleep, causing him to miss the appointment. Detective Robinson offered to come by Appellant's work location. Appellant told Detective Robinson that he would come by the Police Station the next day. Appellant did not show up, offer an explanation, or reschedule the appointment.

N.B. testified at trial. She recalled multiple incidents of abuse, both at her parents' home on Chester Avenue and at her grandparents' home on Rock City Street. N.B. stated

---

[1] It is the policy of this Court to refer to the minor victim's of sexual abuse by their initials.

that the first incident occurred at the Chester Avenue house when Appellant was staying the night. Appellant came into her room, "made it seem like he was wrestling," and "started penetrating [her]." N.B. told Appellant to "stop" and "tried to push him off, but he would keep going and penetrate, he put his penis inside of me." However, N.B. later stated that it "was always over clothes." She explained that this occurred in the bedroom that she shared with her sisters. N.B. was able to stop Appellant when she called for her sisters. "When they came in, [Appellant] made it seem like [they were] wrestling." N.B. claimed that this type of abuse happened more than ten times at the house on Chester Avenue.

N.B. stated that Appellant would often pretend like he was wrestling with her before he would touch her vagina over her clothes, pushing "his hand on the lips of [her] vagina" such that "it would push [her] panties inside of [her]." N.B. admitted that Appellant only touched her with his hands. These incidents occurred at night. She would often wake up to find Appellant on the floor or sitting on her bed with his hands under the covers. Occasionally, she was awakened in pain caused by Appellant's actions. She estimated that this occurred more than twenty times at the house on Chester Avenue.

According to N.B., Appellant would also grab her "butt", put his hand up her shirt and touch her breasts on the outside of her bra, tell her she "should take it," and tell her that "he wanted to fu– [her]." Appellant never tried to remove N.B.'s clothing other than lifting up her shirt.

On one occasion, N.B. claimed that Appellant touched her breasts during the day after making a comment about her breast size.

N.B. stated that she tried to get Appellant to stop by pushing his chest or beating against him or hitting his back. She also asked Appellant to stop, telling him that it "hurt." N.B. stated that Appellant would hold her down with one hand while touching her with the other hand. This behavior occurred during the wrestling incidents, not on the occasions during which the victim awoke to find Appellant in her bedroom touching her privates.

N.B. also testified about abuse that took place at her grandparents' home. The first time, N.B. was sleeping in her grandparents' bed. Her grandfather was sleeping in a chair, and her grandmother was sleeping in her wheelchair in the living room. N.B. woke up and found Appellant lying on the floor next to the bed. Appellant "had his hand under the bed, under the covers" and started touching N.B. She had on her jeans at the time. N.B. stated that Appellant never touched her under her clothes; when Appellant would try to take off her clothes N.B. would call for her sisters. N.B. recalled that she woke up several times to find Appellant touching her while she slept.

The victim testified about another incident at her grandparent's home. The victim was in the kitchen when Appellant walked in, pushed the victim up against the washing machine, and told her that he wanted to "fu–" her. The victim told him to get away. Appellant backed off when their grandfather came into the room.

The victim recounted another incident during which Appellant came into the "middle room" of the house, pulled up the victim's shirt, and started kissing her on the stomach before grabbing her breasts.

N.B. thought that Appellant touched her for the last time in October of 2007. N.B. testified that Appellant passed out on the floor of her bedroom. The victim got up, took her blanket, and went to sleep in the living room. Appellant followed the victim, telling her that his "plan" was to have sex with the victim in the car at the grandparents' home. Appellant touched the victim over her clothing on her vagina, put his hand up her shirt, and started kissing her neck. The victim went back to her bed.

N.B. threatened to tell her father about the abuse. Appellant apologized and told the victim that he was going to get her killed. Appellant also told the victim that they were both at fault for not saying anything. Appellant wrote the victim three letters apologizing and claiming that he would stop the abusing behavior. The victim claimed that she destroyed the letters to prevent her father from finding them.

N.B. did not plan on telling Ms. Marciano about the abuse but could "not hold it" any longer. She was "nervous" at school. Further, N.B. did not recall if she told Detective Robinson that Appellant had penetrated her by placing his hands forcefully on her vagina such that her panties went inside of her vagina. She could not remember if Detective Robinson asked her about penetration. The victim explained that she went into more detail in her interview with the representative from the Child Advocacy Center. However, the victim did not recall the mention of the word penetration during that interview either. The victim claimed that she did not know what "penetration" was at the time of the preliminary hearing and was not asked about penetration.

According to Detective Robinson, the victim did not mention that she was in pain or that Appellant was holding her down during these incidents. However, the victim also did not go into the specifics of each incident during the interview. Detective Robinson did not recall the victim's mentioning that her panties went into her during some of the molestations.

Latoya Mitchell, a forensic interviewer with the Nashville Children's Alliance, questioned N.B. about the abuse allegations. She recorded the interview on "DVD" and prepared a handwritten transcript of the interview questions and answers based on her review

of the DVD. Ms. Mitchell testified that an easel pad was used during the interview process to record the statements of the victim. During the interview, N.B. did not mention penetration or say anything about her clothing going inside her body during the abuse. The interview covered about four or five separate incidents. Ms. Mitchell noted that it was not uncommon for a victim to recall details after an interview.

Appellant called his grandmother, G.D., to testify. G.D. is also the grandmother of the victim. She testified that it was common for her five grandchildren to spend the night at the house that she shared with her husband, R.B. G.D. described her house as having roughly 1,000 square feet with four bedrooms. G.D. testified that she would be able to hear things that were happening in the bedrooms while she was in the living room of the home.

G.D. denied ever seeing Appellant display any inappropriate sexual behavior toward N.B. G.D. explained that the female grandchildren slept in the back bedroom "like sardines." She did not think that it would be possible for Appellant to do anything to N.B. without her knowledge though she agreed that N.B. was "quiet."

R.B. testified that he worked long hours and was often absent from the home. When R.B. was home, he usually slept in the recliner or in his bedroom. He stated that he "wouldn't know" if N.B. were staying the night or not. R.B. testified that he had not seen Appellant act inappropriately with N.B.

Appellant's brother, J.T., testified that he lived in East Nashville with his mother and stepfather, D.B. His stepfather is also the father of N.B. J.T. testified that he and his brother are very close and that he would do anything for his brother. Appellant stayed at his grandmother's house a few times a month. J.T. described Appellant and N.B. as "close" and explained that they spend a lot of time together, mostly at their grandparents' home. J.T. had never seen Appellant act inappropriately with N.B.

J.T. recalled that he had witnessed D.B. take N.B. into a bedroom at the Chester Avenue house several times. D.B. would tell N.B. that he needed to talk to her, the two would go into a bedroom, and be in the room for about ten to twenty minutes. He did not wait for them to exit the room. J.T. thought that this was strange behavior.

At the conclusion of the proof, the jury found Appellant guilty on all counts. The trial court held a separate sentencing hearing during which Appellant was sentenced to an effective sentence of twenty years.

Appellant filed a motion for new trial. The trial court granted a portion of Appellant's motion for new trial, vacating the rape convictions in counts seven through twelve, and the

conviction for sexual battery in count thirteen. The trial court determined, and the State conceded, that it failed to properly elect a particular episode of abuse to correspond to each offense. As a result, Appellant's effective sentence was reduced to eleven years.

Appellant filed a timely notice of appeal, raising issues with regard to the sufficiency of the evidence, the admission of testimony about Appellant's failure to attend voluntary interviews with the police prior to his arrest, the admission of the recordings of the victim's interviews, and the effect of cumulative error on the convictions.

*Analysis*

*Admission of Recordings of Victim's Prior Statements*

Appellant argues that the trial court erred by "admitting four recordings containing two prior consistent statements of the alleged victim." Specifically, Appellant argues that the statements were hearsay; improperly admitted as prior consistent statements; improperly admitted as substantive proof of guilt; and violated his confrontation rights. The State, on the other hand, argues that the statements were admissible as prior consistent statements because the victim's credibility was at issue; Appellant did not request a limiting instruction that the statements were not to be considered as substantive evidence; and Appellant was not prohibited from cross-examining the victim about her statements at trial.

At the outset of our analysis of this issue, we must examine what took place at trial leading up to this issue on appeal. Prior to trial, the victim gave interviews to both the police and Ms. Williams at the Child Advocacy Center. The interview with the child advocacy center was videotaped. At trial, the victim testified at length on direct examination about multiple incidents of abuse. As recounted above, the victim testified on direct examination that Appellant pressed his hands on the outside of her private area, forcing her panties to go into her vagina. She testified that the abuse occurred at least twenty times. Specifically, the victim testified on direct examination that the first time Appellant came into her room, he was wrestling with her and "started penetrating me. I told him to stop and I tried to push him off of me, but he would keep going and penetrate, he put his penis inside of me, because it was always over clothes." Later, the victim explained that "penetrate" is a word that she had heard used by prosecutor and clarified that Appellant "put [the victim's] panties up inside of [her]" rather than his penis. The victim testified that she often called out for her siblings to get Appellant to stop. The victim explained that this type of abuse happened more than ten times where Appellant's hand was on the outside of her clothes and "[h]e would put his hand over my pants, in my vagina area, and he would start to push his hand on my lips of my vagina, and it would push my panties inside of me." The victim also testified that Appellant

-6-

touched other parts of her body by grabbing her butt, putting his hand up her shirt, and touching her breasts under her shirt but over her bra.

On cross-examination, counsel for Appellant asked the victim a series of questions about her failure to tell both the police and Ms. Williams about whether there was penetration during the incidents she described and the discrepancy between the amount of detail given by the victim during the interviews versus the amount of detail given by the victim at trial. The victim could not remember if the detective brought up penetration and did not "remember discussing it" with the detective because she was not familiar with the word "penetration" at that time. The victim testified that she told the detective that Appellant touched her and his hand was moving. The victim admitted that she did not go into as much detail as she was relating at trial. She again explained that she did not use the word penetration during any of her interviews because, at the time, she did not know what the word meant. The victim admitted that she could not remember exactly in what detail she described the assaults to either the police or Ms. Mitchell. However, the victim admitted that she told Ms. Mitchell that Appellant had never "put anything inside of [her]" and only described four or five different incidents, not the twenty to thirty incidents that she insisted occurred during her testimony at trial. Counsel for Appellant also questioned the victim about her preliminary hearing testimony during which the victim only described one or two incidents of abuse.[2]

Later, the State called Ms. Mitchell to testify. Immediately prior to the testimony of Ms. Mitchell, the following exchange took place:

COUNSEL FOR STATE: Obviously [Ms. Mitchell] will be testifying per usual to what happened during the interview, now that [the victim] has been impeached regarding the details of that interview.

The audio recording on the interview is very, very difficult to hear. You can hear all of what Ms. Mitchell says, but almost little to no[thing] of what [the victim] says because, as Your Honor noticed, she is very soft-spoken.

As you're also aware, they write on the easel pad the answers to the child's responses during the course of the interview.

In preparation for her testimony here today, I requested that Ms. Mitchell listen to and watch the interview, reviewing the easel pad, which I

_____

[2]The transcript from the preliminary hearing is not in the record on appeal.

will also put into evidence. And I had her transcribe in handwriting, her own handwriting - - or actually, she did this after I requested her to do these things, but the question asked and then the response as it is reflected on the easel.

Because we're putting, or anticipating putting the actual recording into evidence, the best evidence will be there. But I am also seeking to put this into evidence to accompany that so that if there is any confusion or whatever, they can use it to read along.

I am only bringing this up because I believe that [Counsel for Appellant] has some objection to us doing that.

Counsel for Appellant objected to the introduction and playing of the video, transcript, and easel pad notes because he argued their admission allowed the jury to "double-dip" into the victim's testimony. Counsel for Appellant admitted that he "questioned [the victim] as to the degree of detail that she added and the number of incidents that she discussed in the interview," but he did not believe his questioning rose to the level of impeachment. The trial court disagreed, stating that "it goes to credibility. And when the issue of credibility is raised, you can bring in that information with respect to the forensic interview." As a result, the videotape, the notes taken on the easel pad during the interview, and the transcription of the interview written by Ms. Williams were all entered into evidence.

On cross-examination, counsel for Appellant asked Ms. Williams if, at any time during the interview of the victim, the victim stated that she was penetrated. The following exchange took place:

COUNSEL FOR APPELLANT: During that entire interview that you conducted [the victim] does not say that she had been penetrated at any time, does she?

MS. WILLIAMS: I don't recall that being in my interview.

COUNSEL FOR APPELLANT: Okay, so she didn't say it?

MS. WILLIAMS: No. Not in my interview.

COUNSEL FOR APPELLANT: And she never described to you that there was any fondling that caused part of her clothing to go inside of her, did she?

MS. WILLIAMS: You said, part of her clothing going inside of her?

-8-

COUNSEL FOR APPELLANT: Yes, ma'am.

MS. WILLIAMS: No. I don't recall that in my interview.

Ms. Williams went on to testify that the victim told her specifically about four or five incidents but claimed that as many as twenty incidents had occurred in total.

Counsel for Appellant did not request a special jury instruction that the prior consistent statements should be considered for credibility purposes only.

In the case herein, counsel for the State sought to introduce the videotape, transcript, and paper from the interview as a prior consistent statement of the victim. There are actually two circumstances in which a prior consistent statement of a witness is admissible: (1) where a prior consistent statement is allowed "to rebut the inference that the witness's testimony was a recent fabrication", *State v. Bush*, 942 S.W.2d 489, 516 (Tenn. 1997); and (2) when a witness's prior statement is used out of context to cross-examine the witness. *State v. Boyd*, 797 S.W.2d 589, 593-94 (Tenn. 1990). "The impeaching attack on the witness's credibility need not be successful for admissibility of a prior consistent statement." *State v. Albert R. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387, at *6 (Tenn. Crim. App., at Nashville, Dec.15, 2006), *perm. app. denied* (Tenn. April 23, 2007). More specifically, in *State v. Benton*, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988), this Court explained that a prior consistent statement is admissible:

> [U]nder general evidentiary rules, . . . , as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

*See also Danny Ray Smith*, No. M2009-02275-CCA-R3-CD, 2011 WL 1432033, at *14 (Tenn. Crim. App., at Nashville, Apr. 13, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011) (stating that prior consistent statements may be admissible to rebut the inference that the witness recently fabricated the testimony). It is important to note that properly admitted prior consistent statements are not hearsay because they are not offered for the truth of the matter asserted. *See State v. Livingston*, 907 S.W.2d 392, 398 (Tenn. 1995); *State v. Joseph Shaw, Jr.*, No. W2009-02326-CCA-R3-CD, 2010 WL 3384988, at *7 (Tenn. Crim. App., at Jackson, Aug. 27, 2010), *perm. app. denied* (Tenn.2011); *Albert R. Neese*, 2011 WL 1432033, at *6 ; Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01[9] (6th ed. 2011).

Appellant relies on two cases to support his argument that the admission of the victim's prior consistent statements was error. *State v. Willis Holloway*, No. W2010-01133-CCA-R3-CD, 2012 WL 543047 (Tenn. Crim. App., at Jackson, Feb. 17, 2012), and *State v. Brandon Ackerman*, No. M2010-01979-CCA-R3-CD, 2012 WL 2870568 (Tenn. Crim. App., at Nashville, Jul. 13, 2012), to support his argument that the trial court erred in admitting the evidence, the error was harmful, and he is entitled to a new trial.

In *Willis Holloway*, the defendants were convicted of aggravated robbery, aggravated kidnapping, and aggravated burglary. 2012 WL 543047, at *1. A co-defendant testified at trial that she was charged with facilitation of aggravated robbery and pled guilty. The defendants argued that the trial court erred by allowing the State to introduce her complete, typed statement to police into evidence. *Id.* at *8. The trial court admitted the statement as a prior inconsistent statement. On appeal, this Court noted that several parts of the statement were actually consistent and determined that the trial court erred by allowing the entire statement into evidence as opposed to admitting only those portions of her statement that were inconsistent. *Id.* at *10. This Court commented that "[t]he title of Tennessee Rule of Evidence 803(26) plainly states that it applies to prior inconsistent statements, and the Advisory Commission Comments to the rule explain that the rule's reference to Tennessee Rule of Evidence 613 'makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.'" *Id.* This Court concluded that the consistent portions of the statement were not admissible pursuant to Tennessee Rule of Evidence 803(26) but that the error was harmless because despite inadmissible portions of the statement that were prejudicial, the remaining proof was strong, and it was impossible to say that the error affected the verdict. *Id.*

In *Brandon Akerman*, the defendant was convicted of four counts of soliciting sexual exploitation of minor, two counts of child abuse, one count of rape of a child. 2012 WL 2870568, at *1. At trial, the young victim was unable to recall instances of abuse and could not recall forensic interview even after viewing the video. *Id.* However, the victim testified that statements she made in video were the truth. Testimony at trial indicated that the defendant admitted that he masturbated while in a bed he shared with victim; that it was possible the victim had kissed his penis while she hugged him; and that it was possible that his tongue slipped into victim's vagina while they were playing. *Id.* at *4. The defendant testified at trial. On appeal, the defendant argued that the trial court erred by admitting the video as substantive evidence under 803(26). This Court concluded that although the witness could not recall interview, she did not testify inconsistently with the interview so the interview was not admissible. *Id.* at *14-15. We noted that even if there were an inconsistency, the entire interview would not be admissible. The only portions that would be admissible would be those directly related to the victim's claimed lack of memory. *Id.* at

*16. This Court concluded that due to the limited nature of the proof against the defendant we could not conclude the error was harmless. *Id.* at *16.

Moving now to the case herein, we determine that it is distinguishable from both *Holloway* and *Ackerman*, primarily because the evidence herein was introduced as a prior *consistent* statement for witness rehabilitation purposes rather than a prior inconsistent statement offered to prove the truth of the statement. Had Appellant wished to limit the import of the prior consistent statements, he could have requested an instruction limiting the jury's consideration of the consistent statements to credibility only. *See* Tenn. R. Evid. 105. Under these circumstances we must conclude that the admission of the victim's prior consistent statements after her testimony was impeached at trial was proper.

*Sufficiency of the Evidence*

Appellant argues that the evidence is insufficient to support his convictions. Specifically, he argues that the only evidence to support the convictions was submitted by N.B. and that it was "not legally sufficient" to support the convictions because there was "not sufficient evidence of digital penetration" and N.B.'s testimony changed from the time of her initial interview to her testimony at trial. The State insists that the evidence was sufficient.

To begin our analysis, we note that when a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally deemed with a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id*.

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn

by the trier of fact from circumstantial evidence. *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 599, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). As such, all reasonable inferences from evidence are to be drawn in favor of the State. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *See Tuggle*, 639 S.W.2d at 914.

Appellant herein was convicted of sexual battery, rape, and solicitation of a minor. For the purposes of this case, rape is defined as "unlawful sexual penetration of a victim by the defendant" accomplished with "force or coercion." T.C.A. § 39-13-503(a)(1). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body *or of any object* into the genital or anal openings of the victim's, the defendant's, or any other person's body. . . ." *Id.* § 39-13-501(7) (emphasis added). As our supreme court has explained, "'sexual penetration in a legal sense'" occurs "'if there is the slightest penetration of the sexual organ of the female. . . . It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.'" *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

"Sexual battery" is defined as "unlawful sexual contact with a victim by the defendant" accomplished with "force or coercion." *Id.* 39-13-505(a)(1). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6).

Solicitation of a minor occurs when "a person eighteen (18) years of age or older, by means of oral . . . communication . . . intentionally command[s], request[s], hire[s], persuade[s], invite[s] or attempt[s] to induce a person whom the person making the solicitation knows, or should know, is less than eighteen (18) years of age ... to engage in conduct that, if completed, would constitute a violation by the soliciting adult" of several specifically-enumerated sex crimes. T.C.A. § 39-13-528(a).

Viewing the evidence at trial in a light most favorable to the State, the victim testified that Appellant came into the bedroom that she shared with her siblings at night on more than one occasion. The victim stated that she woke up with Appellant touching her between the legs over top of her clothing. The victim stated that Appellant "push[ed her] panties inside [her] and that would wake [her] up." The jury could properly determine that this action constituted a penetration into the genital area of the victim for the two rape convictions that remained after the grant of the motion for new trial. The victim also testified about multiple incidents during which Appellant touched the victim's breasts or vagina on the outside of her clothing and kissed her on the neck. These incidents were sufficient for the jury to conclude that Appellant was guilty of sexual battery. The victim also testified that Appellant told her that he wanted to "fu– her." The jury clearly accredited the testimony of the victim. This evidence is sufficient to support the conviction for solicitation of a minor. Finally, Appellant makes a general argument that the evidence was insufficient because her trial testimony was more detailed than the statements she gave to others about the abuse and testimony from other people in the house indicated that it was improbable that the abuse occurred without someone else hearing or seeing it take place. Again, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Pruett*, 788 S.W.2d at 561.

*Admission of Detective Robinson's Testimony*

Appellant insists on appeal that the trial court erred in allowing the State to question a detective about Appellant's failure to show up for interviews on two separate occasions. Specifically, Appellant argues that the admission of the testimony violated Appellant's due process rights and was an unlawful comment on Appellant's right to remain silent. The State disagrees that the "testimony was an improper comment on [Appellant's] right to silence, [but] agree[s] that the testimony was irrelevant and should not have been admitted."

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article I, Section 9 of the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. While an accused may waive this right against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436 (1966), as a general matter, the exercise of the constitutional right to remain silent after arrest may not be exploited by the prosecution at trial. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). However, in *Jenkins v. Anderson*, 447 U.S. 231 (1980), the Supreme Court held that due process was not violated by the

impeachment use of pre-arrest, pre-*Miranda* warnings silence where a defendant testified at trial. In that case, the State questioned the defendant as to why he had not phoned for help or reported that he had been involved in an accidental shooting after the shooting occurred. The Court found that the questioning was not a violation of the defendant's due process rights because the silence occurred prior to his arrest, he was not in custody, and the silence was not induced by governmental action. *Id.* at 235-36.

Appellant relies on *State v. Emoe Zakiaga Mosi Bakari*, No. M2010-01819-CCA-R3-CD, 2012 WL 538950 (Tenn. Crim. App., at Nashville, Feb. 15, 2012), to support his argument that allowing Detective Robinson to testify about Appellant's failure to show up at two pre-arrest interviews violated his constitutional rights. In *Bakari,* the defendant filed a motion in limine prior to trial to prevent the State from allowing a detective to testify about facts that suggested the defendant was uncooperative during the State's investigation. *Id.* at *1. The trial court ruled that there was no legitimate reason that the facts could not come into evidence during trial. At trial, the detective testified that he met with the defendant for about an hour before the defendant ended the meeting because he needed to get to work. A second meeting was scheduled that was canceled by the defendant because he had to work. The defendant never called to reschedule. The detective testified that he tried to contact the defendant over the next few months to no avail but finally got the defendant to come in for an interview. The interview was terminated after nineteen minutes. *Id.* at *8-10. On appeal, the defendant argued that the trial court erred by allowing the detective to testify about his unsuccessful attempts to reschedule a consensual interview with the defendant over a three-month period *Id*. at *9-10. This Court concluded that the testimony was not a comment on the defendant's right to silence because the meeting was voluntary and the defendant was not under arrest. *Id.* at *10. However, the testimony was improperly admitted because the "only purpose for the detective's testimony was to insinuate to the jury that the [defendant] was trying to avoid him and was not cooperating with his investigation" when the defendant was under no obligation to cooperate. *Id.* The Court noted that the State provided no other explanation for the relevance of the testimony and concluded that the testimony was improper, but harmless. *Id.*

In the case herein, the facts are strikingly similar. The State sought to introduce the testimony of Detective Robinson about attempted interviews of Appellant prior to his arrest. Defense counsel objected. The following colloquy took place:

> COUNSEL FOR STATE: There are statements by the defendant. He actually speaks to a police officer and says, "Yeah, I am going to come in at this time." He doesn't show. HE stands him up. He calls him again and says, "I'm sorry, I overslept, I'll do it again." And he doesn't show up again. He stands him up again and - -

COUNSEL FOR APPELLANT: And those statements are of no relevance to the case. I mean he didn't incriminate himself or exculpate himself. The only purpose if for the State to show that he had his chance to talk and he chose not to, which is indirectly commenting on his right to not talk to the police; and, then, I have got to try to bail water on cross-examination and they have no purpose in asking it in the first place.

TRIAL COURT: Well, he can still ask the question whether he attempted to speak to the defendant and he can respond. And you, in kind, respond through cross-examination however you want to. But he has the right to ask the question.

COUNSEL FOR STATE: The other thing there, too, is it leaves the door open. Your Honor, for the argument that the police officer didn't do his job in attempting to make that contact. And they are the facts of the case, that he did contact him and did speak with him.

The State then introduced the testimony of Detective Robinson. He stated that Appellant told him two times that he would come in for a voluntary, noncustodial interview. Appellant did not show up for either interview, made excuses when Detective Robinson contacted him about the missed interviews, and failed to keep a rescheduled appointment. We conclude that the admission of the testimony did not violate federal and state constitutional protections of the right to remain silent because Appellant was not in custody at the time that he failed to meet with Detective Robinson.

The analysis does not end at this point however. The State concedes that "the trial court erred" in admitting this testimony [because] the trial court did not give any reasons for ruling as it did, and the prosecutor did not offer any justification for allowing the testimony other than that decried in *Bakari*. Moreover, in a case such as this where the proof of guilt rests solely on the testimony of the victim we cannot say that improperly admitted evidence of Appellant's lack of voluntary cooperation with police did not affect the verdict. In such a close case the Court is of the opinion that Appellant must be afforded a new trial.

*Conclusion*

The judgment of the trial court is reversed, and the case remanded for a new trial in accordance with this opinion.

_____
JERRY L. SMITH, JUDGE